GSG/JK/NG2011R0072

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Jose L. Linares |
| v. | : Criminal No. 14-467 (JLL) |
| ADAM S. GOTTBETTER | : 18 U.S.C. § 371 |

## INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

## RELEVANT ENTITIES AND INDIVIDUALS

1. At all times relevant to this Information:

    a. Defendant ADAM S. GOTTBETTER ("GOTTBETTER") was a resident of New York, New York, a licensed attorney, and the Managing Partner of Gottbetter & Partners LLC, a securities and corporate law firm based in New York, New York, which he founded. Among other things, GOTTBETTER marketed himself as an expert in taking private companies public through a reverse merger process, pursuant to which a private company merged with a public shell company, thereby allowing the private business to be publicly traded. GOTTBETTER variously referred to this reverse merger process as an "Alternative Public Offering," or his trademarked "Gottbetter Public Offering," and according to his law firm's website, its "lawyers manage[d] all of the steps required to complete a reverse merger, from due diligence, review of the business plan, negotiating the merger or acquisition, structuring the transaction to drafting legal documents, including the private placement

1

memorandum and the registration statement." In addition, GOTTBETTER owned Gottbetter Capital Markets, LLC, a registered broker-dealer, which "act[ed] as a placement agent for public and private offerings" and Gottbetter Capital Group, Inc., which "provide[d] financing sources, partners and strategies for public investments in private equities (PIPEs), bridge loans, reverse mergers and self-underwritten public offerings."

   b. Co-conspirator #1 ("CC#1") was a resident of Rumson, New Jersey and was the managing member of a hedge fund.

   c. Co-conspirator #2 ("CC#2") was a Canadian citizen residing in London, England, who promoted and solicited private financing for public companies.

   d. Co-conspirator #3 ("CC#3") was a Canadian citizen and resident of Vancouver, British Columbia, who promoted "penny" or "micro-cap" stocks – the stocks of publicly traded companies with low share prices that often traded on quotation services and marketplaces operated by OTC Markets Group Inc., such as OTCBB, OTC QB, OTC Pink, or Pink Sheets.

   e. Dynastar Holdings, Inc. ("DYNA") was a Nevada corporation with its headquarters in Louisville, Kentucky. DYNA held itself out to be a social media and direct marketing business, and its common stock was quoted under the symbol DYNA on the OTC Pink.

   f. Lido International Corp. ("LIDO") was a Nevada corporation incorporated in or around October 2012. In its public filings with the United States Securities and Exchange Commission, LIDO claimed that it was a

2

development stage company with limited operations; that it was headquartered in Sonsonate, El Salvador; and that its intent was to engage in "the consulting business in commercial cultivation of champignon mushrooms." On or about September 5, 2013, LIDO announced that it had changed its name to "HBP Energy Corp." ("HBPE") in order to "facilitate" its ongoing "discussions" with Firebird Petroleum, Inc., a private Texas corporation, "regarding a possible business combination." Despite its name change, HBPE's common stock was quoted on the OTC QB marketplace under its old symbol "LIDO."

### OVERVIEW OF THE STOCK MANIPULATION SCHEME

2. From at least as early as June 2012 and continuing through in or around November 2013, GOTTBETTER directed a scheme to manipulate the price and trading volume of DYNA and HBPE stock to create the false appearance of market interest in, and to artificially inflate the value of, both securities. GOTTBETTER conspired with others to manipulate the price and volume of these securities to, among other things, make the companies more attractive to potential investors in various private offerings that GOTTBETTER would broker and which would generate substantial fees and other illicit gains to GOTTBETTER, his law firm, and his broker-dealer, and to sell the stocks at the fraudulently inflated prices to the investing public for a profit.

3. To effectuate the scheme, GOTTBETTER and others generally (1) obtained and concealed control of a significant portion of free-trading shares of DYNA and HBPE stock; (2) agreed to fraudulently inflate the price and trading volume of the stocks through a variety of means, including disseminating false

3

and/or misleading promotional materials to the investing public and engaging in manipulative trading of the stocks to create the appearance of market interest; and (3) planned to sell the stocks at the fraudulently inflated prices or use the fraudulently inflated value of the companies to solicit private investments, thereby profiting at the expense of the investing public.

## THE CONSPIRACY

4. From at least as early as in or about June 2012 through in or about November 2013, in the District of New Jersey and elsewhere, defendant

**ADAM S. GOTTBETTER**

knowingly and intentionally conspired and agreed with others to commit offenses against the United States, to wit: (a) securities fraud, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (b) mail fraud, contrary to Title 18, United States Code, Section 1341.

## OBJECTS OF THE CONSPIRACY

5. It was a part and object of the conspiracy that GOTTBETTER and others willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material

4

facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

6. It was a further part and an object of the conspiracy that GOTTBETTER and others knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did cause things to be deposited with and delivered by the U.S. Postal Service and private and commercial interstate carriers for the purposes of executing such scheme and artifice, contrary to Title 18, United States Code, Section 1341.

**MEANS AND METHODS OF THE CONSPIRACY**

7. Among the means and methods by which the conspirators, including GOTTBETTER, would and did carry out the conspiracy were the following:

**The DYNA Manipulation**

a. In or around July 2012, GOTTBETTER recruited a trader (the "Trader") to participate in a market manipulation scheme involving DYNA. At some point prior to this time, GOTTBETTER and CC#1, together with others known and unknown, obtained control of a majority of the free-trading shares

5

of DYNA. GOTTBETTER asked the Trader to "walk up" DYNA's stock price by engaging in manipulative trading and creating and disseminating misleading promotional materials touting the fraudulent trading as recent "market" activity, all for the purpose of fraudulently inflating the price and trading volume of DYNA's stock.

***Manipulative Trading***

b. Over the course of several meetings at his law firm and other communications during the time period of the conspiracy, GOTTBETTER, CC#1 and the Trader agreed that the Trader would engage in manipulative trading of DYNA's stock to facilitate the scheme. At the time, DYNA had little to no legitimate market interest and virtually no trading activity. GOTTBETTER, together with others known and unknown, used the following methods and took the following steps, among others, to carry out the manipulative trading aspect of the scheme:

i. In or around December 2012, GOTTBETTER instructed the Trader to create "volume" in DYNA's stock so that the stock would eventually trade "on its own." Additionally, GOTTBETTER agreed that the Trader would trade DYNA stock among various accounts that the Trader controlled to "build a chart" for DYNA stock – in other words, to create the fake appearance of legitimate trading activity, which would be touted as "market" activity to unsuspecting investors in a later promotional mailer.

ii. In or around April 2013, GOTTBETTER arranged for CC#1 to transfer approximately 1.5 million shares of DYNA stock to the Trader

6

for approximately five cents per share in a private, non-market transaction for the Trader to use in conducting the manipulative trading.

    iii. On or about June 12, 2013, after the Trader had acquired a large block of DYNA shares, GOTTBETTER and the Trader again discussed the details of the manipulative trading. GOTTBETTER directed the Trader to buy and sell DYNA stock through nominee accounts that the Trader controlled in small, incremental transactions designed to "walk up" the stock price to create the false appearance of increased trading volume and market interest in DYNA. GOTTBETTER also agreed to take steps to prevent one of the DYNA shareholders not involved in the scheme from interfering with the Trader's manipulative trading.

    iv. On or about June 13, 2013, at GOTTBETTER's direction, the Trader executed two open market purchases of 2,500 DYNA shares each at $0.20 per share.

    v. Later in the scheme, in or about July 2013, the Trader informed GOTTBETTER that s/he had developed an algorithmic trading system, or black box (the "Black Box"), for the purpose of manipulating the price of stocks. The Trader explained that s/he controlled approximately thirty-two online brokerage accounts that were opened in the names of foreign nominees, and that a computer program that s/he created and controlled could trade between those accounts to create the appearance of massive volume in any stock. GOTTBETTER directed the Trader to use the Black Box in connection with the DYNA scheme.

***The DYNA Mailer***

  c. In addition to manipulative trading, in or about April 2013, GOTTBETTER directed the Trader to create and disseminate a promotional mailer regarding DYNA (the "DYNA Mailer"). The DYNA Mailer was materially false and misleading. Among other things, it bore a fake newsletter name, the "Growth Stock Guru," a non-existent entity selected to further create the appearance of a legitimate promotion. It also touted recent and future market activity without disclosing that the majority, if not all, of that activity would have been attributable to the manipulative trading coordinated by GOTTBETTER, CC#1 and the Trader. Finally, it failed to disclose in the disclaimer either the Trader's or GOTTBETTER's role in the promotion.

  d. During a consensually recorded meeting concerning the DYNA Mailer, GOTTBETTER was presented with three different stock price projections to include in the DYNA Mailer, none of which accurately reflected the legitimate market interest in DYNA at the time. GOTTBETTER carefully considered the three options and then selected $3.75 per share as the price projection, noting that $3.75 would look more realistic. At the end of the meeting, GOTTBETTER was offered a copy of the DYNA Mailer, but refused to keep it, stating that he "never saw it."

***Illicit Fees Earned by GOTTBETTER's Law Firm and Broker-Dealer***

  e. During the course of the DYNA manipulation scheme, GOTTBETTER generated at least $344,966.55 in illicit profits associated with

8

"legal" and other professional services that his law firm and broker-dealer rendered to the co-conspirators in furtherance of the scheme.

**The HBPE Manipulation**

   f. In or about July 2013, before GOTTBETTER, CC#1 and the Trader had launched the DYNA promotional campaign and completed the manipulative trading of DYNA's stock, GOTTBETTER recruited the Trader to participate in another, more profitable and elaborate market manipulation and stock promotion scheme involving a different publicly traded company, HBPE, and two of GOTTBETTER's co-conspirators, CC#2 and CC#3. According to GOTTBETTER, CC#2 was a "big hitter," and CC#2 and CC#3 were looking for someone to "walk up" the price of HBPE stock and "run the market" for the "deal."

### *Obtaining and Concealing Control of HBPE Stock*

   g. At some point prior to August 2013, and continuing thereafter, CC#2, together with others known and unknown, obtained control of the majority of free-trading HBPE shares and then took steps to conceal his ownership and control of HBPE stock by, among other things, transferring shares to nominee entities and individuals that they controlled, and transferring shares to overseas trading accounts.

### *Fraudulently Inflating the Price and Volume of HBPE Stock*

   h. After obtaining secret control of the majority of free-trading HBPE shares, GOTTBETTER, CC#2, CC#3, together with others known and

unknown, used the following methods, among others, to generate interest in HBPE and fraudulently inflate the price and trading volume of HBPE shares:

      i.    CC#2 and CC#3, together with others known and unknown, bought and sold HBPE shares on the open market shortly before the promotional campaign was scheduled to launch. To the investing public, these trades appeared to be purchases by investors not affiliated with HBPE, and gave the false appearance that there was an increasing market demand for the shares.

      ii.    In or about August 2013, GOTTBETTER, CC#2, and CC#3, together with others known and unknown, arranged to sell a majority of free-trading HBPE shares that CC#2 secretly controlled to the Trader through pre-arranged trades between the Trader and CC#2's nominees. After acquiring the shares, GOTTBETTER, CC#2 and CC#3 directed the Trader to artificially inflate the price and volume of HBPE's stock by engaging in manipulative trading using the Black Box. The Trader had previously explained to GOTTBETTER, CC#2 and CC#3 that the Black Box would facilitate the manipulation and artificial inflation of HBPE's stock, specifically, by trading the shares through numerous online accounts that the Trader controlled but that were held in the names of foreign nominees.

      iii.    In addition, CC#2 arranged for friends and associates to buy approximately $1 million worth of HBPE shares from the Trader at relatively low prices, in pre-arranged transactions, with the understanding that these early buyers would later be told when they could sell at a profit.

GOTTBETTER, CC#2 and CC#3 further agreed that the proceeds of these early buyers' purchases would be transferred from the Trader to another co-conspirator, also by means of pre-arranged trades, and the other co-conspirator would use these proceeds to pay for other stock promotion expenses, such as a telephone call campaign and mail campaign falsely touting HBPE's performance, including the price and volume activity generated by the Trader, without disclosing that it was the result of manipulative trading.

    iv.  During these discussions, GOTTBETTER commented that they would "have the full month of November [2013] to walk the price to wherever CC#2 wants it walked, [and then] the mail drops December 1 – it's perfect."

### Coordinated Selling of Manipulated HBPE Stock

    i.  After fraudulently inflating the price of HBPE's stock in the manner described above, GOTTBETTER, CC#2, and CC#3, together with others known and unknown, planned to sell their shares to unsuspecting victim investors at the fraudulently inflated prices, thereby generating substantial illegal profits, which they agreed to split based upon previously agreed-upon percentages. During the HBPE manipulation, GOTTBETTER commented in one recorded conversation that the only other way in which he and his co-conspirators could create so much "liquidity" (or cash) so quickly was by "robbing a bank."

## **OVERT ACTS**

8. In furtherance of the conspiracy and to effect the unlawful objects thereof, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

   a. On or about April 12, 2013, GOTTBETTER caused a stock certificate for 1.5 million free trading DYNA shares to be sent via Federal Express to Belleville, New Jersey.

   b. On or about September 23, 2013, GOTTBETTER caused several HBPE stock purchase agreements to be sent via email from his law firm in New York City to the Trader and an individual located in New Jersey.

   c. On or about October 7, 2013, a co-conspirator directed one of his nominees to place a 5,000 share "sell" order for HBPE shares priced at ten cents per share.

   d. On or about October 16, 2013, a co-conspirator sold approximately five million HBPE shares from nominee entities that he controlled.

   e. On or about October 17, 2013, a co-conspirator caused a stock certificate for five million free trading HBPE shares to be sent by Federal Express to Belleville, New Jersey.

All in violation of Title 18, United States Code, Section 371.

## **FORFEITURE ALLEGATION**

1. The allegations contained in all paragraphs of this Information are hereby realleged and incorporated by reference for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. The United States hereby gives notice to the defendant that, upon conviction of the conspiracy to commit securities and mail fraud offense in violation of Title 18, United States Code, Section 371 charged in this Information, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offense.

3. If by any act or omission of the defendant, any of the property subject to forfeiture described above:

    a) cannot be located upon the exercise of due diligence;

    b) has been transferred or sold to, or deposited with, a third party;

    c) has been placed beyond the jurisdiction of the court;

    d) has been substantially diminished in value; or

    e) has been commingled with other property which cannot be subdivided without difficulty;

It is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 21, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

PAUL J. FISHMAN
United States Attorney

CASE NUMBER: _____

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

ADAM S. GOTTBETTER

INFORMATION FOR

18 U.S.C. § 371

**PAUL J. FISHMAN**
UNITED STATES ATTORNEY, NEWARK, NEW JERSEY

GURBIR GREWAL
NICHOLAS GRIPPO
JENNY KRAMER
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
973-645-2700